STUART v. AUGER & SIMON SILK DYEING CO.

(Circuit Court, D. New Jersey. August 3, 1905.)

PATENTS—ANTICIPATION—PROCESS AND MACHINE FOR LUSTERING SILK.

The Stuart patents, No. 705,715, for a process of intensifying the luster of silk fiber, and No. 705,716, for a machine for carrying out such process, are both void for anticipation; the former by the process of the Hendrie British patent of 1845, and the latter by a French machine from which that of the patent was copied.

In Equity. On final hearing.

John F. Kerr and James C. Chapin, for complainant.
William I. Lewis and Joseph A. Stetson, for defendant.

LANNING, District Judge. On July 29, 1902, patent No. 705,-715, for a process of intensifying the luster of silk fiber, the application for which was filed January 17, 1902, and patent No. 705,716, for a machine for lustering silk, the application for which was filed January 20, 1902, were granted to the complainant. By his bill the complainant sets forth the grant of these patents, charges the defendant with infringing them, and prays for an injunction and an accounting for profits. There is no charge that the machine and the process are capable of conjoint use, but the proofs show, and the defendant's counsel on the argument admitted, that they are. The defenses set up are invalidity of the patents and noninfringement.

It will be convenient to consider first the machine patent. The defendant contends that it is invalid, because anticipated by other patents and devices. At the beginning of his letters patent the complainant declares that he has invented "certain new and useful improvements in machines for increasing the luster of silk, of which the following is a specification, reference being had to the accompanying drawings." Then follows a statement of the object of his invention and a description of the machine shown in the drawings. The machine consists of a stout frame, on the top of which, in notches made for the purpose, are supported, in a horizontal position, wooden rods. On these rods skeins of silk fiber, fresh from the hydro-extractor in which they have been placed for the purpose of driving therefrom a portion of the moisture received in the dye bath, are hung. Below each of these rods, and parallel therewith, another rod is run through the suspended skeins and allowed to hang therein. To each of these last-mentioned rods is hung by S-shaped hooks another rod, which forms the upper rod of another series of skeins, through which a lower rod is run and allowed to hang as in the upper series. Three series of skeins are thus provided for in the machine. To each of the lower rods of the third or lowest series another rod is suspended by S-shaped hooks, and to each of these suspended rods is attached a chain, the lower end of which may be wound around a fixed shaft operated by a crank-lever or ratchet-lever. By this operation, it will be observed, all the skeins of silk fiber are stretched while damp. They are maintained in that

stretched condition, in the room where the machine is located, at a temperature of 90 to 120 degrees for three or four hours while drying. The silk thus stretched and dried possesses a permanent and intensified luster, which it retains when woven into a fabric.

There are three claims in the patent, set forth in the following words:

"What I claim, and desire to secure by letters patent, is:

"(1) In a machine for increasing the luster of silk, the combination of a frame, means for suspending therefrom a series of interdependent skeins of wet silk, flexible means connecting each series with a mechanism located in the lower portion of the frame, and which is adapted to stretch the silk, and to maintain it in a stretched condition while being dried to prevent shrinkage, substantially as set forth.

"(2) In a device for increasing the luster of silk, the combination of a frame, a series of horizontal rods suitably connected and depending from said frame, said rods being adapted to hold skeins of silk stretched between each pair, flexible means connected to the lower portion of the frame, and to the lowest rod of each series for stretching the wet skeins and for preventing the contraction of the same while drying, and ratchet means for holding the said flexible means, as set forth.

"(3) In a device for increasing the luster of silk after it is dyed, the combination of a frame, horizontal rods suitably connected and depending from said frame, said rods being adapted to hold skeins of wet silk stretched around each pair, flexible means connecting the lowest rod with a mechanism in the lower portion of the frame, and such a mechanism for stretching the wet skeins and for preventing the contraction thereof while drying, substantially as set forth."

Machines for stretching and thereby increasing the luster of silk were used long before the complainant's machine was constructed or devised. The complainant does not pretend that he is a pioneer in the invention of a stretching and lustering machine. It appears that on January 9, 1900, Casper Bleuler, as agent of the complainant's employer, Emil Geering, ordered from J. E. Brizon, of Lyons, France, a machine for stretching wool, which Brizon promised to have ready for shipment in about three months. On March 5th Bleuler gave to Brizon the address of the party for whom the machine was intended as "E. Geering, Silk Dyer, Ryle Ave., Paterson, N. J." On March 26th Bleuler informed Brizon that "the Geering concern is a silk dyehouse (silk dyer) employing about 600 men." On April 6, 1900, Brizon shipped the machine, the invoice being headed, "Invoice of machine for lustering silk purchased by E. Geering, Ryle Avenue, of Paterson, N. J., from J. E. Brizon, Iron Worker, of Lyons, 118 Rue de Seze." In the body of the invoice the machine is also described as "one machine for lustering silk." There is no evidence that a wool-stretching machine of the kind sent by Brizon to Geering had ever been used for silk stretching or lustering purposes, and it is quite possible that Brizon, having learned that Geering was a silk dyer, inferred that Geering intended to make such use of the machine he had purchased, and that that inference accounts for the description contained in the invoice. However that may be, the machine reached Geering's factory in Paterson in June, 1900, and the complainant there helped to receive it—19 months before his application for the patent No. 705,-716 was filed. It was promptly set up in Geering's factory, and

put to use by the complainant as one of Geering's employés. It was found to be too weak to stand the strain put upon it, and the complainant subsequently constructed two or three machines, patterned after the Brizon machine, and, finding them to be satisfactory, he, on January 20, 1902, as above stated, filed his application for a patent.

The Brizon machine has (1) a frame; (2) horizontal rods suitably connected and depending from the frame, the rods being adapted to holding skeins of wool or silk; (3) flexible means connecting each series of skeins, or the lowest rod in each series of skeins, with (4) a ratchet or mechanism in the lower portion of the frame used in stretching the wool or silk and holding it stretched for any desired time. The complainant's silk stretching machine is this Brizon wool stretching machine made stronger. The most material difference between the two machines is that in the Brizon machine a rope connects the lowest rod with the crank operated shaft for stretching the skeins, while in the complainant's machine a chain has been substituted for the rope. It is perfectly clear that every element of the machine described in complainant's patent is to be found in the Brizon machine, and that unless the complainant can by satisfactory proofs fix the date of his alleged invention between January 20, 1900, two years before he filed his application (Rev. St. U. S., § 4886 [U. S. Comp. St. 1901, p. 3382]), and June, 1900, when the Brizon machine arrived, his machine patent cannot be sustained. He says he constructed his first machine, for experimental purposes, in July, 1899, but that his invention was embodied not in it, but in a second machine, constructed in February, 1900. In the first machine damp skeins of silk were placed upon rollers, as described in the patent, and to the lowest roller of each set was connected a lever between five and six feet long having weights attached to the end of its long arm. By this apparatus the skeins of silk were kept in a stretched condition while drying. It was an imperfect apparatus, however, since mere weights attached to the lever did not prevent the shrinkage of the silk fibers as they dried. In the second machine levers were used in stretching the silk as in the first, but the long arms were fastened to a beam in the floor by means of a chain, and thus the shrinkage of the silk while drying was prevented. Before he had constructed his third machine, the Brizon machine had arrived. The complainant admits in the most explicit manner that his third, fourth, and fifth machines were constructed after the Brizon machine had been received, and before his application for his machine patent was filed, and that they were all constructed as closely as possible to the pattern of the Brizon machine, except that his machines were made stronger than the Brizon machine. In the Brizon machine and the complainant's third, fourth, and fifth machines, and in his patent, the apparatus for stretching the material placed on the rollers consists not of weighted levers or levers fastened to the floor beams, as in his first and second machines, but of fixed shafts or spindles around which chains or ropes connected with the lowest rods are

wound by means of crank-levers or ratchet-levers which are held in place by ratchet-wheels and pawls. The stretching appliance of the second machine is not described in the patent. If the patent is to be supported, it follows that the stretching apparatus of the second machine must be held to be a mere mechanical equivalent of that in the patent, and in the third, fourth, and fifth machines. The evidence does not permit this to be done, for in the spring of 1902, after the complainant had filed his application for his machine patent, and before it had been granted, he abandoned the stretching device described in that patent and in the application therefor by removing from the third, fourth, and fifth machines their crank-levers, ratchet-levers, ratchet-wheels and pawls and fixed shafts or spindles, and substituting for them the simple device of levers fastened to the floor which was contained in his second machine. On his cross-examination he testified as follows:

"Q. 187. So that there are now in operation four machines, three of them being after the pattern of the French (that is, the Brizon) machine, and the remaining one operating with levers? A. No, sir. Q. 188. Please state the facts. A. All machines, or I should rather say all four machines, in operation at the E. Geering dyeworks, are constructed with levers. Q. 189. When was the change made, on the three machines made after the pattern of the French machine, to the lever construction? A. Somewhere in the spring of 1902. Q. 190. Was that change made on those three machines at substantially the same time? A. Practically the one after the other, as time would allow. Q. 191. How long did it take to alter those three machines, removing the ratchets and supplying the levers? A. The levers were prepared before the drum and ratchets were removed—or, rather, I should say spindle instead of drum—so as less time would be required in remodeling the machine. It was only the work of about two hours' time for to remove the spindles, ratchet wheels, and pawls from one machine. It might have cost from two to three hours more to attach the hooks or claws to the side of such frames to hold the chains in connection with the levers, and also to place beams substantially fastened to the floor beams of the room to hold the chains which held the levers to any desired strain necessary to stretch the silk. Q. 192. How long were the levers which you applied in the spring of 1902? A. Five foot six inches, or as near that as possible."

The complainant has not explained why, after using in the construction of his third, fourth, and fifth machines the ratchet device described in his patent, and using that device until the spring of 1902, he abandoned it, and went back to the lever device contained in his second machine. On that subject he and all his witnesses are silent. Therefore I cannot assume that the ratchet device of the patent and of the third, fourth, and fifth machines is a mere mechanical equivalent of the lever device of the second machine. This being so, it follows that the complainant has failed to carry his alleged invention described in the patent back to the date of constructing his second machine. His third, fourth, and fifth machines, as originally constructed, are exactly described in the patent, and were admittedly modeled upon the Brizon machine after its importation. It must be held, therefore, that the patent is anticipated by the Brizon machine, and that for this reason his machine patent is invalid.

The process patent, No. 705,715, contains but a single claim, which is in these words:

"The process of intensifying the luster of silk fiber, which consists in taking the skeins directly from the hydro-extractor after dyeing, and, while still damp, stretching them and simultaneously maintaining them in a stretched condition and subjecting them in a closed chamber to dry air at a temperature of about 120° Fahrenheit, thereby preventing shrinking during the drying, as set forth."

Long before the complainant filed his application for this patent silk had been lustered by the use of stretching machines. In his application as originally filed he described his invention as one for a "certain new and useful improvement in process for giving a luster to silk and other fibers." This language was subsequently amended to read "a certain new and useful improvement in process of intensifying the luster of silk fiber." Other amendments were made changing the drying heat from "a temperature ranging from 90 to 100 degrees" to "a temperature of about 120° F.," and excluding from the amended application all reference to "other fiber, textile fabric, or finished fabric" mentioned in the original application. No drawings accompanied the original application, but when the amendments were made the drawings which now accompany the patent were furnished. These amendments were made and the drawings were furnished "in view of the suggestions at an interview had with the principal examiner at Washington." Neither the original application, the amended application, nor the patent contains any reference to the drawings, which are the same in every respect as those accompanying the above-mentioned machine patent, No. 705,716. The counsel for the defendant contends that the process patent must have a broad interpretation without reference to the drawings, they illustrating a machine not material to the process. In this contention I think they are right.

The defense is that the complainant's process is old. A British patent granted to Robert James Hendrie in 1845 is relied on as an anticipation of the complainant's process patent. The Hendrie patent was for "an improvement in the preparation of silk," and the process described is one in which dyed or undyed skeins of silk in their damp state were placed around horizontal arms capable of being moved from each other by the use of a capstan and screw. Thus the skeins of silk, as the patent declares, "become stretched and held in tension." While so stretched and held, hot air, hot water, or steam is introduced into a chamber at the bottom of the machine. The chamber being heated, "a warm atmosphere," says the patent, "will be produced about the lower parts of the machine, and, the temperature of the air being thus raised, it will gradually ascend between the radial arms, and in passing through the hanks or skeins will act upon the silk in its distended state, so as to dry it." The claim of the patent is in these words:

"Preparing silk by submitting it in tightly distended skeins or hanks, when damp, to the action of heated air or air of the ordinary temperature, in which it must remain until dry, for the purpose of producing upon its surface a luster or gloss."

This process includes everything contained in the complainant's process, unless it be that in the Hendrie patent the skeins of silk were not subjected "in a closed chamber to dry air at the tem-

perature of about 120° Fahrenheit." But it cannot be that any one skilled in the art would think of carrying on the Hendrie process in any other place than "a closed chamber," for otherwise the heat would be wasted. Nor do I think the fact that Hendrie mentions no particular temperature for drying the silk differentiates his process in any essential respect from that of the complainant. In the Hendrie process the air is artificially heated. It may be raised to 120° or more. The temperature mentioned in the complainant's patent is "about 120° Fahrenheit." This indefinite language of the complainant's patent, together with the fact that in the original application the temperature was fixed at "90 to 100 degrees," raises the presumption that the degree of heat used in the process need only be what is sufficient to dry the skeins of silk within a reasonable time. This presumption becomes a conviction when the machine patent is read. Bearing in mind that complainant's machine is used conjointly with his process, and that only three days intervened between the filing of applications for the two patents, certain language of the machine patent shows conclusively that the temperature used may be anywhere between 90 and 120 degrees, Fahrenheit. That language is as follows:

"My stretching machine is erected in a close room or compartment which is capable of being heated to a temperature of 120 degrees. After the silk or other fiber is taken from the dye bath, * * * I run the temperature of my close room or compartment from 90 to 120 degrees, and leave the skeins there three or four hours in that stretched condition."

The complainant's counsel argue that the Hendrie patent cannot be considered as an anticipation of either of the complainant's patents for the reason that the Hendrie patent has never proven successful. There is no satisfactory proof that it has not been successfully used. It may be that the particular machine described in the Hendrie patent is not so well adapted to carrying out his process as some others; but in this patent he says "there may be various contrivances for carrying out" his process, and that one of them is the machine which he describes. He describes but one process, and that is, in substance, the same as the process described in the complainant's process patent. The record of the proceedings in the Patent Office, which is in evidence, fails to show that the attention of the examiner was at any time drawn to the Hendrie patent. Had it been, I think the complainant's application for his process patent would have been denied. In any event, my opinion is that the complainant's process patent is anticipated in every essential feature by the Hendrie process.

The defendant's witnesses have described other processes, known as the Weidman and David processes, which it is urged exhibit all the essentials of the complainant's process patent. Having reached the conclusion above expressed, I do not deem it necessary to consider them. Neither is it necessary to consider the evidence relating to the question of infringement of either of the patents.

The complainant's bill must be dismissed, with costs.